## 30250. NUNNALLY v. THE STATE.

UNDERCOFLER, Presiding Justice.

Mrs. Alice Elizabeth Nunnally was convicted of

murder and concealing a death by a jury in the Superior Court of Cobb County and sentenced to life imprisonment for murder and to twelve months for concealing a death to run concurrently, and she appeals her convictions to this court.

At trial, the prosecution presented evidence to establish the following:

Late in the evening on July 11, 1974, Mrs. Elaine Calhoun filed a missing persons report on her husband, Lee Calhoun, with the Smyrna, Georgia, Police Department. A description of Lee Calhoun and his automobile was transmitted to all Smyrna police units. His automobile was located in the parking lot of the Belmont Hills Shopping Center about 2:20 a.m., July 12, 1974. At 4:45 a.m. on July 12, 1974, Patrick Nunnally reported to the Smyrna Police Department by telephone that there was a person shot at 2295 Robin Lane, Smyrna, Georgia.

Officers who responded to the call were met in the driveway of the home by Patrick Nunnally, son of the appellant who told them there was a body in the basement of the house and that his mother was inside the house in an hysterical condition. The officers went to the basement but were unable to locate a body or any signs of foul play.

They then talked with the appellant and her husband. Appellant stated that the victim, Lee Calhoun, had come by the home earlier on the morning of July 11, 1974, to pick up a pistol because he was going to his father's house and wanted to take the pistol with him. She related that she got the pistol (a Smith and Wesson, .38 caliber revolver) from the bedroom; that she and the victim were going to the basement; that as she went to hand the pistol to the victim, it struck a metal pipe in the basement discharging; and that it struck him. She stated that she passed out after the shot was fired and did not regain consciousness until later. Appellant then told the officers that the body could be located under some cardboard boxes against the north wall of the basement.

A homicide detective located the body under eight to twelve cardboard boxes stacked about 3 1/2 feet high, lying face down, wrapped in plastic and bound with nylon

stockings. He also recovered a bullet from the basement floor.

Thereafter, appellant retrieved a .38 caliber Smith and Wesson revolver and a box of .38 caliber bullets from a dresser drawer in her bedroom. The revolver was not loaded and was wrapped in cosmoline treated paper in its original box. One bullet was missing from the box.

Laboratory tests indicated that the injury was inflicted at the base of the stairs about twenty feet from where the body was located, that the victim had neither handled nor discharged a firearm, and that the bullet found in the basement was fired from the pistol that the appellant surrendered to the officers.

Autopsy of the body revealed an absence of gross powder wounds or residue on the victim's shirt indicating the gun was at least three feet away from the body when it was discharged. The bullet entered the chest and traveled downward at a 30 degree angle. Death was caused by a gunshot wound between 8:30 a.m. and 11:00 a.m. on July 11, 1974.

Detectives interviewed the appellant at 10:00 a.m. on July 12, 1974. She related the following:

At approximately 10:00 a.m. on July 11, 1974, the victim came to her home on foot. He came in the house and went into the bedroom with her and helped her make up the bed. He inquired about a gun that she owned and said he wanted to take this gun with him to his father's house. She loaded the gun and together with the victim proceeded to walk down the stairs to the basement to go out into the back of the house to fire the gun into an embankment. As they were proceeding down the stairway into the basement, the victim turned and reached out for the gun and it accidentally hit a support beam and fired. At this point she blacked out. When she regained consciousness, the victim was dead. She then went upstairs, placed the revolver on the kitchen table, received a phone call from a relative in Rome, Georgia, concerning a sister who was ill, and blacked out again. Upon waking up, she took the shells out of the revolver and placed them in the shell box. She cleaned the revolver and put it back in its original box.

After that she went downstairs and put the victim's

body on some large plastic sheets and bound him up with the plastic, some garbage bags, and some nylon stockings. She dragged the body to the place of concealment and covered it with the cardboard boxes. She then cleaned the blood from the basement floor with ammonia, washed the throw rug at the base of the stairs in the washing machine, and then cleaned herself. At some point after the shooting her sister and her sister's husband came by relative to visiting her sister in Rome but she did not want to go with them. She stated that she and the victim loved each other.

At approximately 2:00 a.m. on July 13, 1974, detectives again questioned the appellant. At this time she related that the victim had not come to her home on foot, but rather that he had called her and she had picked him up at Belmont Hills Shopping Center and he had lain down in the front seat of the car so he would not be seen by the neighbors. Again she related that they were going down the basement stairs in order to fire the gun in the back yard. She stated that the victim reached around with both hands and attempted to grab the gun from her, and she became afraid as she pulled back and fired the weapon. Appellant stated that she believed that the victim wanted the gun to fire.

An Atlanta police officer had purchased the weapon for the appellant and showed her how to use the weapon.

Sometime about midday on July 11, 1974, Lewis Reagin talked with appellant on the phone about thirty minutes about some church business. He noticed nothing unusual regarding her speech or manner.

Elaine Calhoun, widow of the deceased, testified that the conduct between appellant and her husband had become unusual in the last six months in that appellant, when present with the deceased, would often stare at him in a very uncommon manner.

The defense presented the following evidence:

The appellant testified in her own behalf that she had been acquainted with the victim and his wife for approximately ten years through membership in the church. She obtained the revolver from the police officer who had purchased it for her. She planned to make a gift of the revolver later to this same officer because he was

supposed to move.

She related that on Thursday morning, July 11, 1974, she was working by herself at her home when the victim called and asked her to pick him up at Belmont Hills Shopping Center. When they arrived at her home, the victim volunteered to help her make the beds, and he noticed some packages she had wrapped for a luau and inquired as to whether or not she had obtained the gun. She stated that she had and showed it to him. He showed her how to load it. She and the victim were walking down the stairs into the basement. As she reached approximately the second or third step from the bottom he startled her by reaching back with his left hand and taking hold of her right hand, the hand which had the gun. She was not expecting him to do this and when he did, she pulled back and the gun went off. She had scratches on the back of her hand. She slipped on the step but was not sure whether she slipped just before or just after the gun fired. She heard the noise and as she reached for him, blood gushed all over her back, her hair, her mouth, and her neck. As he fell, she caught him and, under his weight, managed to lay him down at the bottom of the kitchen steps. Blood appeared to be everywhere and she lost consciousness. She could not remember what happened once she got the victim to the floor. She thought about calling an ambulance, but she was in shock, and the next thing she could remember was that the telephone was ringing and she went upstairs to answer it. When she answered the telephone, it was her brother-in-law who told her that her sister in Rome had been injured. After that, she did not remember what happened. She remembers sitting down on the floor and she remembers seeing blood all over her. Further, she remembers thinking about the victim and that he did not like blood. All she could think about at that point was cleaning the blood off the victim. She then removed his pants and washed the blood off his legs. After that, she put a piece of plastic under his head to keep it out of the blood. She raised him up and put plastic under him to get him out of the blood, moved him, and washed the bloody rug and bloody pants. All the blood did not wash out of the pants. After she moved the body she went back

upstairs, took a shower and washed her clothes. The body was placed under some boxes in the basement after having plastic bags put around it. Appellant's other sister came by the house on her way to Rome and helped the appellant go to the bedroom and lie down. When appellant's son and husband came home that evening, she remembered that there was something she needed to tell them. She could not remember what it was, she had a feeling that she was crushed, and that there was something she was supposed to do. She knew that she needed to start supper. She could not open the basement door and could not go down to the basement but she did not know why. She and her husband went out to dinner and her son went to a ball game. Her husband went to a civic club meeting. She was in the house alone for approximately two hours that evening. Something caused her to awaken after she and her husband had gone to bed that evening. It appeared to her like it was a loud noise and the vision of the victim standing between the posts like he appeared that morning came to her mind. She immediately told her husband that there was a body in the basement and he did not believe it. She became hysterical. There was some discussion about what to do. She told the police that when the shot was fired, she heard a ringing and she could still hear the ringing. She did not know where the ringing noise came from but she thought the gun must have hit the post and that caused it.

Appellant had a series of appointments with Dr. Sheldon Cohen, an Atlanta psychiatrist. His evaluation of her was as follows: "My impression was that this woman, after the shooting experienced considerable psychological shock and that she behaved in some ways in sort of an automatic way. That is what you might think of as a splitting of her mind and of her consciousness. She knew that something should be done, but apparently he died rather quickly; and yet at the same time she was concerned about the mess that was made and felt this had to be straightened out . . . So she unconsciously, I think, put part of this out of her mind and went about behavior in a semblance of normality. Now this would be consistent with my impression of her and the impression

that the computer gave me of her habits and the impression that Dr. Knopf got from his two and a half hours with her, and that is that she has great need to be accepted, to appear to be a very good person, to be normal and so forth."

Appellant's husband testified that he had returned home from work on Thursday, July 11, 1974, at approximately 5:00 p.m. He related that he noticed nothing unusual or particular about the conduct of his wife that evening until later on in the evening when she seemed distressed and began to inquire of him as to whether or not he would stand by her no matter what. At this time appellant told her husband there was a body in the basement. After Mrs. Calhoun called in search of her missing husband, appellant's husband went back and asked her and she said, "It's Lee's body that is in the house."

A number of character witnesses testified to appellant's good reputation in the community prior to July 11, 1974. *Held:*

1. Appellant's first four enumerations of error are based on the general grounds. Considering the evidence admitted in court as summarized above, enumerations of error on the general grounds are without merit.

2. In enumerations of error numbers 7, 8, and 18 appellant objects to the trial court permitting the widow of the deceased to sit at the prosecution's counsel table during the course of the trial.

The conduct of the trial of any case is necessarily controlled by the trial judge, who is vested with a wide discretion and in the exercise of which an appellate court should never interfere unless it is made to appear that wrong or oppression has resulted from its abuse. *Atlanta Newspapers v. Grimes,* 216 Ga. 74 (114 SE2d 421) (1960); *Walker v. State,* 132 Ga. App. 476 (208 SE2d 350) (1974).

It is only in cases where there has been no showing by the state that a witness' presence at the counsel table was necessary for an orderly presentation of the case that the appellate courts of this state have found an abuse of discretion in this situation. *Walker v. State,* supra.

In this case the prosecutor stated in his place that the presence of the widow in the courtroom would be

necessary to assist the state in the orderly presentation of the case. The record is devoid of any emotional display by Mrs. Calhoun which would have in any manner prejudiced the appellant's right to a fair trial. No improper conduct on her part was ever brought to the attention of the court.

Enumerations of error numbers 7, 8, and 18 are without merit.

3. In enumerations of error numbers 9, 10, 32, and 35 appellant alleges the court erred in failing to charge the law relating to the defense of insanity.

We note that appellant's counsel at trial made no request for a charge relating to the defense of insanity and made no objection to the trial court's omission of such charge.

Pertinent to these enumerations was the testimony of the appellant and her psychiatrist.

Appellant testified that in the afternoon and evening of July 11, 1974, she could not remember what it was that was pressing on her mind. Her psychiatrist testified that his impression of her "was that this woman, after the shooting experienced considerable psychological shock and that she behaved in some ways in sort of an automatic way. That is what you might think of as a splitting of her mind, of her consciousness. Certainly she knew that this man had been shot, that she had shot him. She knew that something should be done, but apparently he died rather quickly; and yet, at the same time she was concerned about the mess that was made and felt this had to be straightened out. And she was also concerned about — 'Gee, I don't want to upset my husband and son.' So she unconsciously, I think, put part of this out of her mind and went about behavior in a semblance of normality."

When asked whether or not the shock of seeing Mr. Calhoun shot would be sufficient to cause her, from around one o'clock in the afternoon until about 11:30 that night, not to be able to recall the incidents of that morning the psychiatrist responded: "I would say this is possible, but I certainly don't know whether this was so or not." He stated it was a medical possibility.

None of the testimony concerning appellant's loss of

memory relates to the murder charge even remotely or to any time prior to the death of the victim.

Although appellant testified she blacked out twice after the shooting, her testimony indicates she did not forget the body in the basement until after she had taken some of the victim's clothes to wash, cleaned the gun and put it away, wrapped the body, dragged it to the side of the basement, covered it with boxes, cleaned the blood from the basement floor with ammonia, washed the throw rug that had blood on it, washed her bloody clothing, and had taken a shower. It was only after Mrs. Calhoun called inquiring about her husband that she recalled that the body was in the basement.

The hiatus in memory was after all acts of concealment were complete and although possibly applicable to a failure to report the death from the time of its concealment until her memory returned at the time of Mrs. Calhoun's call, it in no way relates to the acts of concealment or indicates any delusional compulsion as to the concealment which overmastered her will to resist committing the crime.

The evidence did not demand that the trial judge charge the jury on Code Ann. § 27-1503 (Ga. L. 1952, p. 205; 1972, p. 848), or the general principles of law relating to the question of insanity. See *Massey v. State,* 222 Ga. 143, 147 (149 SE2d 118) (1966); *Floyd v. State,* 143 Ga. 286 (84 SE 971) (1915); *Garrett v. State,* 126 Ga. App. 83, 84 (189 SE2d 860) (1972).

4. In enumerations of error numbers 11 and 12 appellant alleges the court erred in charging the following: "If you find a homicide is proved to have been committed in this case by this defendant with an instrument which if you find was, in the manner in which it was used upon the occasion in question, a weapon likely to produce death, the law from the use of such weapon in that manner presumes malice and the intent to kill. It is not incumbent upon the accused to prove an absence of malice if the evidence for the prosecution shows facts which may excuse or justify the homicide. If the homicide was in your opinion unlawful, and if there was present the intent to kill and malice, the offense would be murder, and it would be your duty to find the defendant

guilty of the crime of murder."

These passages were followed by instructions by the court that: "It is not incumbent upon the accused to prove an absence of malice if the evidence for the prosecution shows facts which may excuse or justify the homicide. Ladies and gentlemen, I charge you that in this case the accused is not required to produce evidence of mitigation, justification, or excuse on her part to the crime of murder where the mitigation, justification, or excuse is shown by the evidence on the part of the State. It is not required of the accused to prove an absence of malice if the evidence for the State shows facts which may excuse or justify the homicide."

These instructions correctly state the law and did not place the burden on the appellant to prove or present evidence to justify or mitigate the homicide. These enumerations of error are without merit.

5.   Appellant in her 13th enumeration of error alleges that the trial court erred in the following charge: "I charge you that if you believe, and believe beyond a reasonable doubt, that the defendant, Alice Elizabeth Nunnally, did in this County in the State of Georgia commit the offense of murder by unlawfully and with malice aforethought kill and murder one Lee Calhoun, a human being, by shooting him with a .38 caliber pistol, thereby inflicting upon the said Lee Calhoun mortal wounds from which he died, contrary to the laws of said State, and good order, peace and dignity thereof, then you would be authorized to convict the defendant of the offense of murder as charged in this bill of indictment."

The thrust of appellant's position here is that the use of the preposition "by" was error in that it would cause the jury to believe that the only thing that they must find in order to return a verdict of guilty as to Count 1 of the indictment was that the victim was shot with a .38 caliber pistol from which wounds he subsequently died.

Recently, in the case of *State v. McNeill,* 234 Ga. 696 (217 SE2d 281) (1975) this court quoted with approval the following language: "In *Brown v. Matthews,* 79 Ga. 1 (4 SE 13), this court said: 'A charge, torn to pieces and scattered in disjointed fragments, may seem objectionable, although when put together and con-

sidered as a whole, it may be perfectly sound. The full charge being in the record, what it lacks when divided is supplied when the parts are all united. United they stand, divided they fall.' This is still sound law."

The charge considered in its entirety can not be construed to lead the jury to believe that they could return a verdict of guilty of murder if they should find only that the victim was mortally wounded by a shot fired from a .38 caliber pistol.

Enumeration of error number 13 is not meritorious.

6. In her 16th and 17th enumerations of error appellant alleges that the trial court erred in charging the jury as follows: "That the acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted. That a person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted."

The quoted portions of the charge are correct and relevant statements of well established legal principles codified in the laws of this state. Code Ann. § 26-603 (Ga. L. 1968, pp. 1249, 1269) and § 26-604 (Ga. L. 1968, pp. 1249, 1269). The trial court correctly charged the jury with these principles of law.

7. In enumerations of error numbers 26, 27 and 30, appellant alleges the trial court erred in failing to charge defense requests to charge dealing with the presumption of innocence and reasonable doubt.

The trial court charged as follows: "Every person is presumed innocent until proved guilty. No person shall be convicted of a crime unless each element of such crime is proved beyond a reasonable doubt. The burden of proof rests upon the state to prove each element of the offense charged beyond a reasonable doubt. The state, however, is not required to prove the guilt of the defendant beyond all doubt. Moral and reasonable certainty is all that can be expected in a legal investigation.

"A reasonable doubt means just what it says. It is a doubt of a fair-minded, impartial juror honestly seeking the truth, not an arbitrary or capricious doubt; but it is a doubt arising from a consideration of the evidence, from a lack of evidence, or from a conflict in the evidence. If

after giving consideration to all of the facts and circumstances of the case, your minds are wavering, unsettled and unsatisfied, then that is the doubt of the law and you should acquit. But if that doubt does not exist in your minds as to the guilt of the defendant, then you should convict."

The court adequately presented the law as it relates to the presumption of innocence and the court's failure to charge the appellant's requests was not error.

8. In enumerations of error numbers 28 and 29 the appellant alleges the trial court erred in the instructions given on good character and in refusing to give a requested instruction.

The requested charge was: "I charge you, gentlemen of the jury, that evidence of good character is a substantive fact, and like any other fact tending to prove innocence, it may raise a reasonable doubt of guilt sufficient to authorize acquittal."

The complete charge given by the trial court relating to the issue of good character was as follows: "Now, ladies and gentlemen, the court charges you, in criminal cases the defendant is permitted to offer evidence as to general good character. Evidence of good character may be of itself sufficient to create a reasonable doubt as to the guilt of the accused, where otherwise no reasonable doubt would exist, or when considered in connection with the other evidence in the case, it may be sufficient to create such a doubt. Nevertheless, if the jury should believe beyond a reasonable doubt that the defendant is guilty as charged in the indictment, they would be authorized to convict, notwithstanding evidence of general good character. Good character affords no valid excuse or justification for committing a crime. Good character, like any other fact tending to establish innocence, is a substantive fact and should be so regarded by the jury along with other evidence in the case in determining whether the defendant is guilty beyond a reasonable doubt."

Considering the entire charge as it relates to the issue of good character the trial court did not err in giving the charge and denying the requested charge. The charge clearly instructed the court that good character in and

of itself may be sufficient to create a reasonable doubt as to the guilt of the accused.

Enumerations of error numbers 28 and 29 are without merit.

9. In enumeration of error number 34 appellant avers the court erred in its charge as it relates to concealing death by failing to advise, charge and make clear to the jury, that the crime of concealing death must not only include the act or acts set forth in Code Ann. § 26-1104 (Ga. L. 1968, pp. 1249, 1277), but that in addition thereto there must be present an intent to commit the crime of concealing death.

The trial court charged the offense of concealing death as follows: "Now, ladies and gentlemen, the charge in count two of this indictment being that of concealing death, I will give you the definition of that offense as codified in the Criminal Code of the State of Georgia and defined in Ga. Code Ann. § 26-1104. I charge you the following: A person commits concealing death when he, by concealing the death of any other person, hinders a discovery of whether or not such person was unlawfully killed."

Thereafter the court charged: "Ladies and gentlemen, I charge you certain definitions which are codified as definitions in the Criminal Code of the State of Georgia. In this connection I charge you, ladies and gentlemen, that a crime is a violation of a statute of this state in which there shall be a union of joint operation of act, or omission to act, and intention. That a person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, or intention."

The instruction clearly charges that the act to be criminal must be intentional rather than non-volitional.

This enumeration of error has no merit.

10. In enumerations of error numbers 14 and 15 appellant alleges the court erred in giving the following charges to the jury: "An admission, as applied to a criminal case, is a statement of fact or circumstance by the defendant, not amounting to a confession of guilt, but tending to prove the offense and from which the guilt

may be inferred," and "An incriminating statement is one made by the defendant which tends to establish his guilt, or tends to disprove some defense set up by him or one from which together with other facts, if any are proven, guilt may be inferred."

Challenge to both of these instructions was considered in *Fowler v. State,* 187 Ga. 406 (1 SE2d 18) (1939) and rejected. These enumerations are without merit.

11. After considering appellant's allegations of error concerning specific portions of the trial court's charge, the refusal to give specific requested instructions, and after reviewing the evidence and the trial court's charge, we conclude that enumerations of error numbers 5 and 6 are without merit. The enumerations contend that the charge of the court was not adjusted to the evidence, was confusing, misleading, and erroneous and was violative of the Fifth and Fourteenth Amendments of the Constitution of the United States because it violated due process of law by placing the burden of disproving guilt on the appellant.

12. In enumerations of error numbers 19, 20 and 21, appellant objects to the admission of testimony concerning her statements in her home at approximately 5:00 a.m. on July 12, 1974, and while in custody at 10:30 a.m. on July 12, 1974, and at 2:00 a.m. on July 13, 1974.

At the time of appellant's statements at 5:00 a.m. on July 12, 1974, the police officers were unable to ascertain that a crime had occurred because they had not been able to locate the body, and neither the appellant nor her husband was then under suspicion of anything. The appellant was not in custody but on the contrary was in the comfort of her own home with her husband and grown son present. This is a completely different setting from that considered by the United States Supreme Court in Miranda v. Arizona, 384 U. S. 436 (86 SC 1602, 16 LE2d 694, 10 ALR3d 974) (1966) where the accused was an "in custody" suspect of his police interrogators.

Testimony concerning the other statements of appellant were admitted only after a hearing was held by the trial court out of the presence of the jury in accordance with Jackson v. Denno, 378 U. S. 368 (84 SC

1774, 12 LE2d 908) (1963). The trial court made a preliminary determination that warnings in conformity with the requirements set down in Miranda v. Arizona, supra, were adhered to and made a determination that the statements were voluntary and admissible for the jury's consideration. Thereafter they were submitted to the jury under appropriate instructions concerning admissions and incriminating statements. His determination is supported by a preponderance of the evidence as required by *High v. State,* 233 Ga. 153 (210 SE2d 673) (1974).

Enumerations of error numbers 19, 20 and 21 are not meritorious.

13. In enumeration of error number 25 appellant alleges the court erred in allowing the testimony of a firearms specialist as a rebuttal witness.

Calling an unlisted witness in rebuttal is not error. *Prevatte v. State,* 233 Ga. 929, 930 (214 SE2d 365) (1975); *Eberheart v. State,* 232 Ga. 247, 253 (206 SE2d 12)(1974).

14. Enumerations of error numbers 22, 23, 24, 31, and 32 concern the trial court's refusal to direct a verdict of not guilty. There was evidence admitted in court from which the jury could find every element of both offenses and they were properly instructed including instruction on circumstantial evidence. The evidence, or lack of it, did not demand a verdict for the defendant on either charge. These enumerations of error are without merit.

15. In enumeration of error number 36 appellant pleads in the alternative that the court erred in not charging the jury on involuntary manslaughter.

As we read the testimony, the homicide was either murder or accident. The trial court did not err in omitting a charge on involuntary manslaughter and none was requested at trial. *Bonds v. State,* 232 Ga. 694 (208 SE2d 561) (1974); *Scott v. State,* 210 Ga. 137 (2) (78 SE2d 35) (1953); *Sirmans v. State,* 229 Ga. 743 (2, 3) (194 SE2d 476) (1972); *Meadows v. State,* 230 Ga. 471 (3) (197 SE2d 698) (1973).

*Judgment affirmed. All the Justices concur, except Ingram, J., who concurs in the judgment only, and Jordan J., who dissents.*

ARGUED SEPTEMBER 9, 1975 — DECIDED NOVEMBER 24, 1975 — REHEARING DENIED DECEMBER 15, 1975.

*Holcomb & McDuff, Robert E. McDuff, Terry E. Willis,* for appellant.

*George Darden, District Attorney, B. Wayne Phillips, Assistant District Attorney,* for appellee.