## 30635. DAVIS v. THE STATE.

JORDAN, Justice.

Curfew Davis was indicted for the murder of Ann Starnes by the Grand Jury of Troup County. He was tried before a jury, found guilty and sentenced to death. He appeals from the judgment and the sentence.

According to the evidence produced on the trial Ann Starnes was last seen alive on July 19, 1974, at approximately 1:30 p.m. She worked for Linden Laboratories and on that date she had picked up blood specimens and pap smears from the Women's Clinic in LaGrange, Georgia. She was a resident of Muscogee County, Georgia, and on July 22, 1974, the Sheriff's Department of that county received a report that she was missing. On July 28, 1974, her 1973 Chevrolet Malibu automobile was found in LaGrange parked on a side street. Curfew Davis was arrested the following day and charged with automobile theft.

After being fully informed of his rights the appellant was questioned and denied seeing the victim or her car or having been in the car. Later when told that he had been seen in the car, he stated that he obtained Miss Starnes' car from one E. D. Holloway. Investigation revealed that Holloway's work records showed that he was in Atlanta at the time the appellant claimed to have obtained the automobile from him.

On July 19, 1974, the day Miss Starnes disappeared, Curfew Davis was living in LaGrange with Betty Bailey. Betty Bailey testified that she kept a .22 caliber pistol in her bedroom drawer, but that on July 22 she found the

pistol in a different drawer and did not know who had moved it. On July 30 police officers searched Miss Bailey's home with her consent and seized the pistol which was introduced into evidence. The bullet in Miss Starnes' skull was fired from this .22 caliber pistol.

On July 31 upon further questioning Curfew Davis told the police that he had thrown Miss Starnes' car keys in a hedgerow. Upon searching the hedgerow at the location specified the officers found the keys to Miss Starnes' car.

On August 4, 1974, Curfew Davis told the police that he first spotted the car on a street in LaGrange and told them that he took certain laboratory supplies from the car and discarded them in a wooded area. The supplies belonged to Linden Laboratories and were valued at $200 to $300. Police found them at the location specified by the appellant. The appellant stated that the keys were in the car when he took it.

(On August 12, 1974, the appellant entered a plea of guilty in Troup Superior Court to the offense of motor vehicle theft of the Starnes car. Evidence of this conviction was not introduced into evidence until the sentencing phase of the appellant's trial.)

On August 28, 1974, the appellant told police officers he would show them the location of Miss Starnes' body. Appellant guided two officers to a wooded area where Miss Starnes' badly decomposed remains consisting primarily of her skull and bones were found. One officer stayed at the scene until a representative of the Georgia Crime Laboratory picked up her body.

Dr. Larry Howard of the Georgia Crime Lab examined the remains and determined that Miss Starnes died of a .22 caliber bullet in her brain. There were also severe fractures of her face and jaw bones. Her clothing had been torn into strips and tied together as if they had been used as bonds to tie her.

A positive identification of Miss Starnes' remains was effected by identification of her teeth by her dentist, identification of eye glasses found by her body as the same prescription given to her by her opthalmologist, identification of two rings found at the scene by the friend who had given them to her, and identification of the torn

clothing found with the remains as belonging to Miss Starnes.

On the same day appellant led the police to Miss Starnes' body, he made a statement contradicting his prior statements. At this time he stated that on July 19, 1974, he was walking the streets of LaGrange when he saw Miss Starnes' car. He noticed the keys in the ignition and was about to leave when he noticed Miss Starnes tied and gagged in the back seat. She had a wound on the left side of her head. When he got in he saw her move. He got in and drove to Swift Street where he took the laboratory equipment out of the trunk and threw it away. He then drove to a wooded area where he dumped Miss Starnes' body. He stated that she was dead at this time. He checked her body when he dumped it in the woods. He cleaned up the blood from Miss Starnes on the back seat. (Police officers found no trace of blood in the car.)

On August 31, 1975, the appellant made another statement which contradicted his earlier statements. He stated that he was with JoAnn Porter and "Lewis" when he went into a store to buy some beer; that when he came out of the store, he saw JoAnn and Lewis in the process of hijacking an automobile; that the car was being driven by a young man, whom JoAnn ordered to slide over from the steering wheel; that JoAnn had a small revolver and when he asked what was going on, JoAnn ordered him to get in and drive; that they drove to JoAnn's house and everyone got out and went inside; that "Lewis" told him to take the car and clean it out; that he took the stuff from the car and scattered it in a trash pile; that he returned to JoAnn's house where JoAnn and Lewis had taken the gagged victim into a bedroom; that "I was still trying to figure what was going on"; that he then heard shots and rushed into the bedroom and took a baseball bat away from JoAnn after she had struck the victim with it; that "Lewis" had taken a pistol away from JoAnn; that after things quieted down they discussed what they would do with the girl; that he helped them dump Miss Starnes' body in the wooded area, and that he kept her automobile.

The police investigated but were never able to substantiate the allegations concerning JoAnn Porter and Lewis.

The defense presented no evidence.

1. In his first three enumerations of error the appellant alleges error in excluding potential jurors who stated that they had conscientious objections to capital punishment, and in Enumerations 11, 12, and 13 makes related enumerations concerning supplementing the transcript.

Three issues are involved herein. They are: (a) The sufficiency of the transcript of the voir dire examination on the issue of conscientious objection to capital punishment; (b) The sufficiency of the examination of the jurors who were disqualified because of conscientious objections to capital punishment; and (c) The authority of the trial court under Code Ann. § 6-805 to supplement the trial transcript of the voir dire examination by order.

In *Owens v. State,* 233 Ga. 869 (214 SE2d 173) (1975) we limited the power of the trial court to supplement the trial transcript pursuant to Code Ann. § 6-805 in the absence of a transcription of the voir dire examination by the reporter. We permitted supplementing the trial transcript in *Coker v. State,* 234 Ga. 555 (216 SE2d 782) (1975) only to the extent of establishing that no jurors had been excused for conscientious objection to capital punishment after appellant in that case had asserted in his brief that a number of prospective jurors had been excused on this ground.

As we read the transcript of the voir dire examination of the prospective jurors in the case sub judice, questions and the answers thereto concerning conscientious objection to capital punishment on the part of those jurors excused on that ground are reported in the transcript adequately for a determination of the Witherspoon issue. This being the case, it is not necessary for us to consider the order of the trial court supplementing the record or his authority to do so under the cited statute. Code Ann. § 6-805.

With one exception, each juror excused for cause on the ground that he was conscientiously opposed to capital punishment stated that he would not vote for the death penalty under any circumstances. This exception involved one prospective juror on the first panel of twelve who were examined. The transcript reflects the following:

"Are any of you conscientiously opposed to capital punishment? Juror Lamb: I am. Fleming: You are? Juror Lamb: Yes. Mr. Fleming: They're qualified, your Honor. Mr. Weldon: Your Honor, I object to that. We have a right to a fair and impartial Jury just because he's opposed to capital punishment, I mean, capital felony. We've got a man that's got just about as much right to a fair trial as anybody else. The Court: Well, — Mr. Fleming: (Responding.) Your Honor, please, I consider that as an improper statement. The fact that a person opposes capital punishment or believes in capital punishment, doesn't make them fair or impartial, one way or the other. The Witherspoon case very clearly holds that if a person will under no circumstances go for it be instructed. The Court: Have you got your objections, Mr. Weldon, for the Record? Mr. Weldon: (Responding) Yes, I feel that this Juror should be allowed to remain, assuming that she's, that would be fair and impartial towards both sides, and the fact that she's opposed to capital punishment should not disqualify her. The Court: Alright, Mr. Weldon. Disqualify the Juror for cause. Come out of the Jury Box, please."

Although the objection to this juror viz., "the fact that she's opposed to capital punishment would not disqualify her" is insufficient, nevertheless the examination of this juror as indicated by the reporter's transcript is inadequate under Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968), as amplified in Boulden v. Holman, 394 U. S. 478 (89 SC 1138, 22 LE2d 433) (1968), and Maxwell v. Bishop, 398 U. S. 262 (90 SC 1578, 26 LE2d 221) (1970). As we stated in *Owens v. State,* supra, Witherspoon held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon, supra, pp. 522, 523. Such a venireman cannot be excluded unless he makes it unmistakably clear that he would vote against the death penalty regardless of what transpires at trial, or that his attitude on the death penalty would prevent him from impartially passing on the issue of guilt, or that he

would not subordinate his personal feelings on the death penalty to his oath as a juror to obey the law of the state as charged by the trial court.

Although juror Lamb was excused without making it unmistakably clear that she would vote against the death penalty regardless of what transpires at trial or that her attitude on the death penalty would prevent her from impartially passing on the issue of guilt, or that she would not subordinate her personal feelings on the death penalty to her oath as a juror to obey the law of the state as charged by the trial court we do not believe that under Witherspoon, Boulden, and Maxwell, supra, the death penalty in this case must be set aside.

In each of the cases cited a sizeable number of prospective jurors (15 in Boulden) were excused after expressing general opposition to the death penalty without examination as to the extent of their opposition. Such illegal elimination of an identifiable "group" violates the "cross section of community concept." As expressed in Witherspoon, supra (p. 521), "a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death," and "the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death," and "the State . . . has stacked the deck against the petitioner." As was further stated in Witherspoon, supra (p. 520), *"Culled of all* who harbor doubts about the wisdom of capital punishment—of all who would be reluctant to pronounce the extreme penalty—such a jury can speak only for a distinct and dwindling minority." And, as stated by Mr. Justice Douglas in his concurring opinion in Witherspoon (p. 524), "The constitutional question is whether the jury must be 'impartially drawn from a cross section of the community' or whether it can be drawn with systematic and intentional exclusion of some qualified *groups.*" (Emphasis supplied.)

The rationale of Witherspoon and its progeny is not violated where merely *one* of a qualified class or group is excluded where it is shown, as here, that others of such group were qualified to serve. This record is completely void of any evidence of a systematic and intentional

exclusion of a qualified group of jurors so as to deny the appellant a jury of veniremen representing a cross section of the community.

In this case the transcript indicates that only one prospective juror out of 83 was perhaps improperly excused. There were other veniremen who initially expressed opposition to capital punishment who were not excused when upon further examination it was determined they were not unalterably opposed to the death penalty under all circumstances. We find no indication on the part of the prosecutor of the trial court to "organize a tribunal to return a verdict of death," "deliberately tip the scales toward death," or "stack the deck against the petitioner."

Under the circumstances of this case this enumeration is without merit.

2. In Enumeration 4 the appellant alleges the court erred in failing to charge the law of the State of Georgia as regards the concealment of death, to wit:

"A person commits concealing death when he, by concealing the death of any other person, hinders a discovery of whether or not such a person was unlawfully killed, and upon conviction shall be punished as for a misdemeanor." Code Ann. § 26-1104 (Ga. L. 1968, pp. 1249, 1277.)

This charge was not required since the state did not indict the appellant for this crime. We have recently affirmed a conviction for murder and of concealing a death arising from the same criminal transaction. *Nunnally v. State,* 235 Ga. 693 (221 SE2d 547) (1975). They are separate crimes, requiring separate acts and criminal intent. The failure of the state to indict and the court to charge on this crime was therefore favorable to the defendant under the facts of this case.

3. In Enumeration 5 the appellant alleges the court erred in failing to grant the defendant's motion for a directed verdict in the case.

We have summarized the evidence presented in some detail above. We conclude that this evidence was sufficient from which the jury was entitled to find that the appellant committed the offense as charged. The trial court did not err in refusing to grant the defendant's

motion for a directed verdict.

4. Appellant's enumeration of the general grounds in Enumerations 6, 7, 8 and 9 are likewise without merit.

5. Appellant's Enumeration 10 that the court erred in failing to grant defendant's motion for a new trial upon the merits of the case is not argued in the brief. We have examined appellant's motion for new trial as amended and find no new matter not contained in the enumerations before this court. This enumeration is without merit.

6. In our sentence review we have considered the aggravating circumstances found by the jury and the evidence concerning the crime introduced in court.

We have reviewed the sentence as required by Ga. L. 1973, p. 159 et seq. (Code Ann. § 27-2537 (c) (1-3)), as we did in *Coley v. State,* 231 Ga. 829 (204 SE2d 612) (1974), and in each subsequent case involving the death penalty under this statute. We conclude that the sentence of death imposed here was not imposed under the influence of passion, prejudice, or any other arbitrary factor. The evidence supports the jury's finding of the following statutory aggravating circumstances:

(1) The murder was committed by a person with a prior record of conviction of a capital felony (Code Ann. § 27-2534.1 (b) (1)); (2) The offense of murder was committed while appellant was engaged in another capital felony (Code Ann. § 27-2534.1 (b) (2)); and (3) The murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery of the victim (Code Ann. § 27-2534.1 (b) (7)).

We have compared the evidence and sentence in this case with similar cases contained in the appendix attached to this opinion. Curfew Davis' sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant.

*Judgment affirmed. All the Justices concur, except Nichols, C. J., Gunter and Ingram, JJ., who dissent.*

ARGUED JANUARY 13, 1976 — DECIDED APRIL 15, 1976 —
REHEARING DENIED MAY 6, 1976.

*James E. Weldon, H. J. Thomas, Jr.,* for appellant.
*William F. Lee, District Attorney, Robert H. Sullivan, Assistant District Attorney, Arthur K. Bolton, Attorney General, Harrison Kohler,* for appellee.

### APPENDIX.

Similar cases considered by the court: *Lingo v. State,* 226 Ga. 496 (175 SE2d 657) (1970); *Johnson v. State,* 226 Ga. 511 (175 SE2d 840) (1970); *Pass v. State,* 227 Ga. 730 (182 SE2d 779) (1971); *Kramer v. State,* 230 Ga. 855 (199 SE2d 805) (1973); *Hunter v. State,* 231 Ga. 494 (202 SE2d 441) (1973); *House v. State,* 232 Ga. 140 (205 SE2d 217) (1974); *Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975); *Floyd v. State,* 233 Ga. 280 (210 SE2d 810) (1975); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Jarrell v. State,* 234 Ga. 410 (216 SE2d 258) (1975); *Berryhill v. State,* 235 Ga. 549 (221 SE2d 185) (1975); *Dobbs v. State,* 236 Ga. 427 (1976); *Goodwin v. State,* 236 Ga. 339 (1976); *Pulliam v. State,* 236 Ga. 460 (1976).

GUNTER, Justice, dissenting.

I dissent for the reasons stated in my dissenting opinion in *Eberheart v. State,* 232 Ga. 247, 255 (206 SE2d 12) (1974).

INGRAM, Justice, dissenting.

The egalitarian concepts embedded in our fundamental law on jury selection require a result different from that reached by the majority opinion.

In this case, a juror stated, "Yes," to the question of whether she was conscientiously opposed to capital punishment. This was all she was asked about her views on capital punishment. She was not asked if she were unalterably opposed to capital punishment or could not vote for it under any circumstances.

In this setting of limited voir dire examination, the trial court excused the juror for cause. Defense counsel specifically objected and told the court, "this juror should be allowed to remain . . ." The majority opinion concludes this was not error.

The effect of the trial court's ruling which excused

this juror for cause over objection by the defendant was to give the state an extra peremptory strike because the juror was not shown to be disqualified for legal cause. I believe this violates the constitutional proscription, announced in Witherspoon v. Illinois, 391 U. S. 510, that a juror shall not be excused for cause merely on the basis that he has expressed conscientious scruples against the infliction of capital punishment.

In *Simmons v. State,* 226 Ga. 110 (172 SE2d 680) (1970), this court said on p. 114 of a unanimous opinion: "The court erred in excusing two jurors from serving in this case solely on the basis that they stated on a voir dire question that they were conscientiously opposed to capital punishment. Another indispensable question, required by Witherspoon v. Illinois, 391 U. S. 510, supra, was not asked. The failure to ask such an additional question, the answer to which would truly reveal the jurors' qualification to serve, was error."

In a case decided in 1975 by this court, *Simmons v. State,* supra, was cited with approval by Justice Hill, speaking for the court: "The standards of jury selection applicable in death cases are set forth in Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776), as amplified in Boulden v. Holman, 394 U. S. 478 (89 SC 1138, 22 LE2d 433), and Maxwell v. Bishop, 398 U. S. 262 (90 SC 1578, 26 LE2d 221). Witherspoon held that 'a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.' Witherspoon, supra, pp. 521-523. *Such a venireman cannot be excluded* unless he makes it unmistakably clear that he would vote against the death penalty regardless of what transpires at trial, or that his attitude on the death penalty would prevent him from impartially passing on the issue of guilt, or that he could not subordinate his personal feelings on the death penalty to his oath as a juror to obey the law of the state as charged by the trial court. See *Simmons v. State,* 226 Ga. 110 (12) (172 SE2d 680); *Miller v. State,* 224 Ga. 627 (8) (163 SE2d 730)." (Emphasis supplied.) *Owens v. State,* 233 Ga. 869, 871 (214 SE2d

173) (1975).

In my judgment, *Simmons* and *Owens* control the present case. The error could not be harmless because nobody knows (nay, not even the majority of this court) whether the state would have exercised one of its statutory strikes to excuse this juror if she had not been excused for cause by the trial judge. If she had not been excused but rather had served on the trial jury, who can say, without boasting of clairvoyance, that she would not have influenced her fellow jurors to impose a sentence other than the death sentence for the defendant?

The error is too plain and the uncertain consequences of it too obvious for me to vote to affirm this sentence of death. The majority strain to approve it when a new trial on the punishment could be ordered to do justice to all.

I am authorized to state that Chief Justice Nichols joins in this dissent.