**Murriel CRAWFORD, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 57602.**

Court of Criminal Appeals of Texas, En Banc.

July 16, 1980.

Rehearing Denied April 15, 1981.

Selden B. Hale and Charles W. Fairweather, Amarillo, and Emmett, Colvin and David L. Botsford, Dallas, for appellant.

Tom Curtis, Dist. Atty., Morris L. Overstreet and John Loudder Davis, Asst. Dist. Attys., Amarillo, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

DOUGLAS, Judge.

Murriel Don Crawford appeals from his conviction upon a plea of guilty to the offense of capital murder. Punishment was assessed at death.

The record reflects that a few minutes after midnight on the morning of October 22, 1975, appellant was awakened in his apartment by co-defendant David Mabra. Approximately forty-five minutes later, Mabra and appellant drove to the farm of Jack Watson, a former employer of Mabra's. There they stole a hunting knife, lariat rope and binoculars from an International Scout parked on the farm property, along with two .12 and .410 gauge shotguns and a .22 caliber rifle. They then went to appellant's apartment with the stolen goods.

A short time later, appellant and Mabra drove in appellant's pickup truck to a 7–11 Store, intending to rob the cashier. They abandoned their plan and proceeded to an Exxon service station with similar intentions. They again became nervous and left the station without robbing the attendant. Finally, appellant and Mabra drove to a Toot 'n Totum food store and parked appellant's truck where it could not be readily seen. Carrying the .410 shotgun which had been stolen from Jack Watson, the pair entered the store and robbed the night cashier, Edith Whitfield, of $32.00. After Mrs. Whitfield handed appellant the contents of the cash register in a paper bag, appellant fired at her, narrowly missing her head. Appellant then fired a second shot at point blank range and struck Mrs. Whitfield in the left eye, causing her instantaneous death.

The two men fled the scene of the murder and returned to appellant's apartment. There they gathered together all the goods which had been stolen from the Watson farm and placed them, along with the murder weapon, in the trunk of Mabra's car. The pair got into the car and headed for Jack Watson's farm but were stopped en route by Amarillo police officer Tom Porter because the muffler made excessive noise. A traffic citation was issued to Mabra and both defendants were interviewed by Officer Porter. Mabra gave the officer permission to search the car, but the officer declined and appellant and Mabra were told they were free to go. They proceeded to the Watson farm where they replaced the stolen items, including the murder weapon, in the Scout from which they had been taken. Appellant and Mabra drove back to Amarillo.

Three weeks after the murder of Edith Whitfield, appellant and Mabra initiated a conversation with Jim White, a neighbor and friend. In the course of this conversation, appellant bragged to White that he and Mabra had robbed the Toot 'n Totum store and that he himself had shot the deceased in the eye and "pushed her brains out the top of her head." Appellant described for White their flight to the Watson farm, their encounter with the Amarillo police and other details of the crime. He related that they returned to the scene of the crime intending to see whether or not the Toot 'n Totum was equipped with cameras which might have recorded the murder and robbery on film. Appellant stated to White that if Officer Porter had opened the trunk of Mabra's car he would have stabbed him. Jim White testified that as appellant described the grisly details of the crime he showed no shame, sorrow or guilt. Appellant's only regret was, as he told White, that he did not stop to eat candy while in the Toot 'n Totum store.

Jim White informed Amarillo police detective Gary Richards of his conversation with appellant and Mabra. Both appellant and Mabra were interviewed by Detective Richards concerning the crime and were released. Following their release, they returned to the Watson farm and stole the .410 and .12 gauge shotguns which they had previously stolen. The guns were sold by appellant to two workers at Maywood, Inc., where he was employed.

Prior to his arrest, appellant admitted to three fellow employees at Maywood that he had murdered the deceased. Karen Richie testified that appellant told her that he had done the shooting. He laughed about the incident. Sandra Carreker testified that appellant stated to her on a coffee break, "Maybe they'll come and get [me] for shooting that old lady." On that occasion, too, he laughed about the murder. Keith Carreker testified that appellant told him that he "shot that old bitch in the face." Carreker stated that when he asked appellant if he was drunk, appellant answered that he was cold sober and that if Carreker said anything to anyone about the murder his partner would "waste him."

Ricky Wayne Holik testified that in January, 1976, he, David Mabra and the appellant attended a concert in Amarillo. After the concert, at appellant's instigation, the three of them went to Maywood, Inc. There they burglarized the building and stole a number of tools. To destroy evidence of the breakin, appellant set fire to the building. On August 25, 1976, appellant and Mabra were arrested for the burglary of the Maywood plant. While in custody, appellant confessed to the burglary and, later, to the murder of Edith Whitfield. His written confession was admitted into evidence at trial.

▌ Thirteen grounds of error are advanced in appellant's brief. First he complains of testimony wherein reference was made to an oral statement of the co-defendant David Mabra.

"Q. (Prosecutor) And did you thereafter have a discussion and an interview with Don Crawford?

"A. (Detective Richards) I did.

"Q. Also with a fellow named David Mabra?

"A. Yes.

" * * *

"Q. In any event, after your—did you have occasion to ask the defendant, Don Crawford, inquire whether or not he or Richard or David Mabra had been involved as the robbers and murderers in that Toot 'n Totum murder?

"A. Yes, I did.

"Q. Did they admit it, deny it, or what?

"A. They denied it."

Appellant contends that since David Mabra was not on trial and did not testify any statement made by him was inadmissible against the appellant.

There was no objection to the testimony. Mabra's statement, although hearsay as to the appellant, was not inculpatory. Under such circumstances, any error committed was harmless. *Thomas v. State*, 533 S.W.2d 796 (Tex.Cr.App.1976).

Appellant contends that the trial court erred in permitting the district attorney to read sections of David Mabra's inadmissible initial confession while cross-examining the appellant. He contends that the prosecutor did not cross-examine appellant from the statement, but that he used cross-examination as a guise under which to introduce large portions of the co-defendant's confession before the jury. He also complains of the following statement made by the district attorney during his cross-examination of appellant:

"You are still sticking to the version you gave after Mabra fingered you, that Mabra took [the gun] in."

Appellant argues that the prosecutor's remarks made reference to the confession of the non-testifying co-defendant in which appellant was blamed for the actual shooting.

■ In light of the fact the jury returned a directed verdict upon appellant's plea of guilty, it cannot be said that the improperly admitted confession contributed to appellant's conviction. A plea of guilty before a jury admits all of the elements of the offense and is conclusive of a defendant's guilt. See *Fierro v. State*, 437 S.W.2d 833 (Tex.Cr.App.1969).

Appellant, however, contends that the evidence bore heavily on the jury's determination of the special issues which, under Article 37.071(d)(2), (e), V.A.C.C.P., resulted in the assessment of the death penalty. In his written confession which was introduced into evidence by defense counsel he admitted that he was a party to the robbery and murder of Edith Whitfield. He also testified that he helped prepare for and commit the robbery. He denied, however, carrying the gun or shooting the deceased. The prosecution, in cross-examining the appellant, read certain portions of David Mabra's first confession which named appellant as the one who carried the weapon into the store and shot the deceased. It is appellant's theory that the jury assessed the death penalty on the basis of its belief that appellant was the "trigger man", and that without David Mabra's confession it would have assessed a life sentence.

Appellant testified that he signed the confession in order to clear his conscience and that he felt a great sense of relief after having done so. It was only after reading Mabra's statement that appellant said to Detective Garrett: "My God, he's putting us both in the electric chair," whereupon he immediately gave a written statement admitting his involvement in the crime but placing the blame for the shooting on David Mabra.

Article 38.24, V.A.C.C.P., provides:

"When part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all letters on the same subject between the same parties may be given. When a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence."

In *Vanderbilt v. State*, 563 S.W.2d 590 (Tex.Cr.App.1978), we observed that Article 38.24 does not restrict the explanatory act, declaration, conversation, or writing to the time when the act, declaration, conversation or writing sought to be explained occurred but extends the rule so as to render such acts or statements admissible, if necessary to a full understanding of, or to explain the acts or statements introduced in evidence by the adverse party.

Mabra's confession was read aloud to appellant by Detective Garrett during the conversation preceding appellant's confession. Appellant having introduced his own statement into evidence, the State was properly permitted to give evidence of other writings, conversations and transactions which fully explained appellant's confession, the context in which it was given and the motive behind it. In short, the prosecution was entitled to prove the whole of what was said immediately prior to appellant's confession under Article 38.24, supra.

■ Even if it had been error for the prosecutor to read portions of the co-defendant's confession while cross-examining

appellant, such error would not merit reversal. The other evidence against appellant was, as a whole, overwhelming. The evidence which, in particular, showed appellant to have been the trigger man was so great as to render the co-defendant's statement relatively insignificant. Appellant admitted to four friends that he had shot Edith Whitfield. As in *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the appellant's confession was minutely detailed and completely consistent with the objective evidence. And, as in *Schneble*, "the 'minds of an average jury' would not have found the State's case significantly less persuasive" had the prosecutor's recitation of Mabra's confession been excluded. There was a joint trial in the *Schneble* case. In the present case there was no joint trial. We conclude that the reasoning in the *Schneble* case applies here. If any error was committed, it was harmless.

Next, appellant asserts that the prosecutor was erroneously permitted to inject false evidence at trial. During cross-examination, the following exchange took place between the district attorney and appellant:

"Q. *You had something to shoot Mrs. Whitfield with, though, didn't you?*

"A. Not in my possession.

"Q. *Walked in there with a loaded gun, didn't you?*

"A. No, sir.

"Q. You are still sticking to the version you gave after Mabra fingered you, *that Mabra took it in?*" (Appellant's emphasis)

Appellant contends that by these remarks the prosecutor implied to the jury that appellant was lying when he denied carrying the .410 shotgun into the Toot 'n Totum.

Appellant argues that the prosecutor's remarks concerning his carrying of the murder weapon were made in bad faith and with knowledge of their falsity. The basis for this contention is the fact that in his second confession David Mabra denied shooting Edith Whitfield but admitted that he initially carried the gun into the store. In his brief, appellant claims that a polygraph examination of Mabra supported the truth of his second written statement. Appellant theorizes that the prosecutor knew the results of the polygraph, knew that appellant did not carry the gun into the Toot 'n Totum, and consequently, should not have implied to the jury that appellant walked into the Toot 'n Totum brandishing the murder weapon. For the prosecutor to do so, appellant asserts, was to introduce before the jury evidence which he knew to be false.

■ This contention is without merit. Appellant assumes that the district attorney was obligated to believe David Mabra's second statement (in which he admitted carrying the gun into the store) and disbelieve Mabra's initial confession (in which he stated that appellant carried the gun). The prosecutor was under no such obligation regardless of the fact that a polygraph examination had been conducted. Results of polygraph examinations, by virtue of their unproven reliability, have consistently been held to be inadmissible for any purpose. *Reed v. State*, 522 S.W.2d 466 (Tex.Cr.App. 1975); *King v. State*, 511 S.W.2d 32 (Tex. Cr.App.1974); *Lewis v. State*, 500 S.W.2d 167 (Tex.Cr.App.1973); *White v. State*, 496 S.W.2d 642 (Tex.Cr.App.1973). The prosecutor had no duty whatever to rely on such inadmissible and potentially unreliable data in determining which of David Mabra's confessions were true. The prosecutor had no duty to believe either of Mabra's statements. Appellant, having voluntarily taken the stand, was subject to being discredited like any other witness. In his attempt to impeach appellant's testimony, the prosecutor was free to reject the co-defendant's versions of the crime and vigorously cross-examine the appellant concerning his possession of the murder weapon immediately prior to the shooting. *Myre v. State*, 545 S.W.2d 820 (Tex.Cr.App.1977); *Weber v. State*, 472 S.W.2d 136 (Tex.Cr.App.1971); *Patterson v. State*, 338 S.W.2d 469 (Tex.Cr. App.1960).

■ Appellant contends that the court erroneously allowed into evidence extraneous offenses of burglary and arson. Ricky Wayne Holik testified at length concerning

appellant's commission of burglary and arson at Maywood, Inc. There was no objection to such testimony until after Holik had completed his testimony on direct examination. Thereafter, appellant took the stand and, on direct examination by defense counsel, testified to having committed the burglary of Maywood, Inc. The admission of improper evidence will not constitute reversible error where the defendant voluntarily gives testimony the same as that which is admitted over objection. *Cowan v. State*, 562 S.W.2d 236 (Tex.Cr.App.1978); *Lovell v. State*, 538 S.W.2d 630 (Tex.Cr. App.1976); *Allen v. State*, 536 S.W.2d 364 (Tex.Cr.App.1976); *Watson v. State*, 532 S.W.2d 619 (Tex.Cr.App.1976); *Dogget v. State*, 530 S.W.2d 552 (Tex.Cr.App.1975).

■ Even if error had not been waived, evidence of appellant's extraneous offenses would nevertheless have been admissible. Inasmuch as such offenses showed appellant's tendencies toward criminal conduct, they were relevant and admissible pursuant to Article 37.071, V.A.C.C.P., which gives the trial court wide discretion in determining what evidence may be offered. *Robinson v. State*, 548 S.W.2d 63 (Tex.Cr.App. 1977); *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976). No error is presented.

Appellant next argues that the prosecution erred in failing to provide the defense with a copy of an exculpatory police report prior to trial. The requested report stated that appellant had been cleared after his initial interrogation concerning the murder of Edith Whitfield. Appellant alleges that the report was relevant on numerous issues but particularly so on the issue of the voluntariness of his confession and that it should, therefore, have been produced at a pretrial *Jackson v. Denno*[1] hearing.

He relies upon *Ridyolph v. State*, 503 S.W.2d 276 (Tex.Cr.App.1974), and cases cited therein for the proposition that it is reversible error for the prosecution to either actively suppress or inadvertently fail to disclose evidence which might exonerate or be of material value to the accused.

■ In determining whether reversible error has occurred, this Court must look to the three factors which the Supreme Court deemed relevant in *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1971). Those factors are (1) the suppression of such evidence by the prosecution after a request by the defense, (2) the evidence's favorable character for the defense, and (3) the materiality of the evidence. Considering these factors as applied to the facts of the present case, we conclude that no reversible error is shown.

■ The record before us does not reflect that the requested police report was suppressed by the prosecution. Prior to trial, appellant filed a motion for the disclosure of exculpatory evidence. At the pretrial hearing appellant's motion was granted. Immediately thereafter, and before the State had had an opportunity to comply with the appellant's motion, a pretrial hearing was conducted on the voluntariness of appellant's confession. During the hearing appellant demanded immediate production of the requested report. In view of the fact that the State did furnish appellant with a copy of the report during trial, it cannot be said that such evidence was deliberately or even inadvertently withheld.

Neither can it be said that the requested report was material. In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court held that (1) the mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial does not establish "materiality" in the constitutional sense, and (2) that the omitted evidence must have been such as would create a reasonable doubt about the defendant's guilt. The police report in the present case, had it been provided prior to trial, would not have created a reasonable doubt as to the voluntariness of appellant's confession. Regarding the report's relevance to other issues raised at trial, appellant is not in a position to complain inasmuch as the report, including the exculpatory portions, was admitted into evidence and a copy thereof was furnished to counsel.

1. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

When appellant pled guilty, it was immaterial that the officer might not have concluded that he had enough evidence upon which to charge appellant.

Next appellant complains of the prosecution's failure to disclose negative fingerprint test results until the day of trial. He does not allege that any harm resulted from this delay in disclosure. Nor has it been shown that the test results were exculpatory in nature, thus obligating the State to disclose them to appellant. Had they been exculpatory, any error in their delayed disclosure to appellant must be considered harmless in light of appellant's guilty plea and the overwhelming weight of the evidence.

Appellant next alleges that the court erred in excusing potential juror Martha B. Stulce for cause on the grounds that neither the requirements of *Witherspoon v. Illinois*,[2] nor V.T.C.A., Penal Code, Section 12.31, were satisfied. No objection was raised. Failure to object to the improper exclusion of a potential juror waives such error on appeal. *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.1976); *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1977).

In four grounds of error appellant alleges that the court erred in refusing to grant a mistrial after the prosecutor introduced before the jury evidence of an oral statement made by the appellant in which he denied committing the charged offense. The statement was neither inculpatory nor prejudicial. Appellant's objection was sustained and an instruction to disregard was given. Error, if any, was cured. *Sternlight v. State*, 540 S.W.2d 704 (Tex.Cr.App.1976); *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App. 1976); *Marlow v. State*, 537 S.W.2d 8 (Tex. Cr.App.1976); *Paredes v. State*, 500 S.W.2d 160 (Tex.Cr.App.1973).

He also complains of the following testimony by Karen Richie:

"Q. (By the Prosecutor) Did you talk to David—yes, to David Mabra—about the shooting of Mrs. Whitfield?

"A. No sir. When he took his lie detector test—

"MR. FAIRWEATHER: Your Honor, I move for a mistrial at this time."

The witness' answer, although unresponsive, neither prejudiced appellant nor reflected upon his guilt or innocence. The witness' statement made no reference to appellant, but rather, concerned the co-defendant David Mabra. Error, if any, was harmless.

Appellant urges that the prosecutor erred in refusing to furnish appellant a copy of the State's witnesses' statements until after such witnesses had testified. Appellant's contention is without merit and contrary to this Court's holding in *White v. State*, 496 S.W.2d 642, 645 (Tex.Cr.App. 1973); and *Hoffman v. State*, 514 S.W.2d 248, 253 (Tex.Cr.App.1974).

Next he contends that the court erroneously admitted the appellant's written confession into evidence on the grounds that it was induced by police officers' promises that the death penalty would not be sought. The evidence adduced at the *Jackson v. Denno* hearing showed appellant's confession to have been freely and voluntarily given. Appellant was duly warned of his rights and subjected to no coercion or abuse of any kind. We do not find, nor does appellant direct our attention toward any evidence that appellant's confession was induced by promises that the death penalty would not be sought. Moreover, the confession was introduced by appellant himself. Any complaints regarding its voluntariness were thereby waived. *Morales v. State*, 466 S.W.2d 293 (Tex.Cr.App.1971).

Finally, appellant attacks the sufficiency of the evidence upon which the jury could have returned an affirmative finding on special issue No. 2, i. e., that a probability existed that the appellant would commit criminal acts of violence which would constitute a continuing threat to society. Article 37.071(d)(2), V.A.C.C.P. Appellant urges that reversal is required because no testimony was offered by the State specifically in support of this special issue.

---

**2.** 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1967).

It is well established that the introduction of expert psychiatric or psychological testimony is not a prerequisite for a jury finding of "yes" on special issue No. 2. *Brock v. State*, 556 S.W.2d 309 (Tex.Cr.App. 1977); *Burns v. State*, 556 S.W.2d 270 (Tex. Cr.App.1977); *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1977). The testimony adduced at trial concerning the crime itself and the circumstances surrounding its commission may be more probative on special issue No. 2 than any other evidence which the State might offer. *Brock v. State*, supra; *Burns v. State*, supra.

In the present case, as in *Brock*, the evidence showed that appellant committed a brutal and senseless murder in the course of a robbery even though the deceased had surrendered the contents of the cash register to him and offered no resistance. Appellant's intent was not merely to terrorize the deceased with the initial shotgun blast. His intent was to cause her death by firing again at point blank range. He was later heard to laugh and to brag about the fact that he had seen Edith Whitfield's brains pushed out the top of her head. His statements to Keith Carreker and Jim White reflected his willingness to kill again. After admitting his responsibility for the murder to Keith Carreker, appellant threatened to have him killed if Carreker revealed what he knew to anyone else. Appellant also told Jim White that he would have stabbed Officer Tom Porter if he had attempted to search the trunk of David Mabra's car.

Three months after the murder of Edith Whitfield, appellant committed the offenses of burglary and arson. In committing the latter offense, appellant knowingly created a risk that loss of human life could occur. Both offenses were probative on the issue of whether appellant was likely to commit criminal acts of violence subsequent to the offense charged in the indictment. See *Granviel v. State*, supra, and *Felder v. State*, 564 S.W.2d 776 (1978).

For any of his actions appellant showed no remorse or sorrow whatever. His only regret, as has been noted, appeared to be that he did not seize the opportunity to eat candy in the Toot 'n Totum store following the murder. We find that sufficient evidence was presented from which the jury could conclude that a probability existed that appellant would commit future acts of criminal violence which would pose a continuing threat to society.

No reversible error having been shown, the judgment is affirmed.

CLINTON, J., not participating.

PHILLIPS, Judge, dissenting.

The majority holds that the trial court did not err in allowing the prosecutor to read to the jury the critical portion of co-defendant David Mabra's first confession, in which Mabra implicated appellant as the "triggerman" to the offense. The majority further concludes that even if error were committed, the error was harmless beyond a reasonable doubt. As I cannot accept either conclusion, I am compelled to dissent.

Appellant testified in his own defense. He admitted being a party to the offense. However, he denied carrying the shotgun into the store or killing the deceased. He testified that Mabra killed the deceased. Appellant introduced his written confession in support of his testimony. The confession related the same facts as testified to by appellant:

> . . . We went in the Toot N Totum and David was carrying the shotgun. He had it beside his leg. The lady was watching me and he stood in front of the cash register. I went and got some hamburger buns and some lunch meat and came back to the counter. David said "You want to give us some money". She said "What". He said "Do you want to give us some money". She said "Why no, o[f] course not". He put the shotgun on top of the cash register and she said "Anything you want". She opened the cash register and got all the money out of the cash register and put it in a little sack and said "Do you want the change" and I said "No, we don't want the change, what is under the drawer". She raised up the drawer and said "There is only this dime, there is no money here". I said "Well

give us the dime". I put the dime in the bag and I took the bag and the lunch meat and the hamburger buns and stepped back from the counter and dropped them. I picked them back up and David put the shotgun back on top of the cash register. When he did, he popped it down against the cash register and it went off. It blew her hair up and scared her and it hurt her because she just moaned so he shot her again. He just stood there with his mouth open and the shotgun on the cash register. I grabbed him by the coat and dragged him out of the store. We got outside and got in the pickup and went back to my apartment . . .

On cross-examination and over defense counsel's objection, the prosecutor elicited from appellant that he gave the confession only after police showed him a confession given by Mabra earlier that day that exculpated Mabra and placed responsibility for the offense entirely on appellant. The prosecutor then produced Mabra's confession and began to cross-examine appellant with it. Defense counsel strenuously objected that the confession was inadmissible hearsay and the prosecutor's reading it violated appellant's Sixth Amendment right to confront and cross-examine witnesses. The court overruled appellant's objections, and the prosecutor read the following from Mabra's confession:

> . . . Donny parked his pickup in front of the store and I got out to get my snuff. Donny said as I got out of the truck, "I think I'll rob this place." I thought he was joking as we are all the time making comments like this to each other. I went in and picked up a can of Copenhagen snuff and started to put it on the counter. At this time, I heard Donny open the door and looked around and I saw that Donny had the shotgun behind him. Donny said to the lady clerk, "Give me your money." She said, "You've got to be kidding. Is this some kind of joke?" Donny then pulled the shotgun out and placed it on top of the cash register. She gave him the money in a paper sack and then Donny shot one time. He was holding it with one hand

and missed the first shot. I saw the lady's hair kinda fluff out and I saw the shot hit the wall. I turned and was trying to get out of the store and yelled "Crawford". As I was running out, I heard the second shot. I did not pay for the snuff and I was so scared that I crushed the can of snuff in my hands. I got back in the pickup and Donny was right behind me . . .

On redirect examination defense counsel attempted to read from another confession given by Mabra the day after he gave the one set forth above. That confession read in pertinent part:

> One other fellow and I drove up to the Toot 'n Totum store in the early morning hours, well after midnight, and we went in with the intention of robbing the store. I carried in a .410 shotgun, and I held it on the lady who was the clerk, who I now know to be named Whitfield, while we robbed her, and I also was threatening her with the shotgun after we robbed her when my companion grabbed the gun and it went off twice, shooting the clerk in the head and killing her.
>
> My companion and I ran from the store . . .
>
> The previous statement which I gave to Officers Kirkwood and Collins last night *left out the truth* about my participation in our attempt to rob the Toot 'n Totum and the way I handled the gun and threatened the clerk before she was shot, but this statement truthfully described my real part in the crime. (emphasis added)

The state objected to defense counsel's attempt to read this confession. The court sustained the objection, and prohibited appellant from reading the confession to the jury or alluding to it in any way.

At the hearing on appellant's motion for new trial it was stipulated that at the time of trial the prosecutor was aware of Mabra's second confession. It was further stipulated that the prosecutor knew that the results of a lie detector test administered to Mabra indicated that the second confession was the truth.

The majority concludes that because appellant introduced his confession in evidence, the state "was entitled to prove the whole of what was said immediately prior to appellant's confession," pursuant to Art. 38.24, V.A.C.C.P. I am willing to accept that the scope of Art. 38.24 extends to the situation presented here—the statute provides in part that:

> ... When a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence.

However, the trial court egregiously erred in admitting Mabra's first confession without also admitting Mabra's second confession as requested by appellant. As this Court previously has pointed out, the purpose of Art. 38.24 is to reduce the possibility that the fact finder will receive a false impression by hearing only a part of the evidence concerning a conversation, writing, act, or declaration. *Vanderbilt v. State*, 563 S.W.2d 590 (Tex.Cr.App.1978); *Roman v. State*, 503 S.W.2d 252 (Tex.Cr.App.1974); see *Rodriguez v. State*, 597 S.W.2d 917 (Tex.Cr.App.1980) (Phillips, J., dissenting). The admission of Mabra's first confession led the jury to believe that, according to Mabra, appellant wielded the murder weapon and in fact was entirely responsible for the offense. The jury also was informed that appellant confessed only after seeing Mabra's first confession. The inevitable impression left on the jury by this evidence was that Mabra claimed to be innocent, and that appellant confessed as he did simply in order to place part of the blame for the commission of the murder on Mabra.

This impression was entirely misleading and false. In actuality, Mabra repudiated his first confession, admitting that he carried the shotgun into the store and threatened the deceased with the weapon. This version of the events corroborated several parts of appellant's confession. It undoubtedly would have lent support to appellant's claim that Mabra was the triggerman. Mabra expressly stated that his second confession was the correct version, and the lie detector test confirmed this. Given that the court admitted Mabra's first confession, it was absolutely critical to go forward and admit Mabra's second confession in order to prevent the jury from receiving a totally false impression of the evidence, and to enable the jury to assess Mabra's credibility as a witness. The admission of the first confession without the second constituted error.

Moreover, the majority fails to recognize that the application of Art. 38.24 in this case violates appellant's Sixth Amendment right to confront and cross-examine witnesses. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). This right ["has] long been recognized as essential to due process." *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). See *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *Coulter v. State*, 494 S.W.2d 876 (Tex.Cr.App.1973).

*Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), a companion case to *Pointer*, supra, establishes that action such as was taken by the prosecutor in this case denies a defendant his right of confrontation and cross-examination. At the defendant's trial in that case the state called the codefendant to the stand to testify against the defendant. The codefendant, a man named Lloyd, invoked his privilege against self-incrimination and refused to answer any questions. Under the guise of refreshing Lloyd's memory the prosecutor asked Lloyd to confirm or deny statements read by the prosecutor from Lloyd's confession. Lloyd refused to answer the questions, but the prosecutor continued until he had read the entire confession. The confession inculpated the defendant. The Supreme Court held that reading the confession to the jury was the equivalent of admitting the confession in evidence, and concluded that the defendant's inability to cross-examine Lloyd concerning the confession "plainly denied [him] the right of cross-examination secured by the Confrontation Clause." *Id.* at 380 U.S. 419, 85 S.Ct. 1077.

In *Bruton v. U. S.*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court again held that the admission of a co-defendant's confession denied the defendant his right of cross-examination. The Supreme Court viewed the admission of the confession as so prejudicial that it held the error was not cured by the trial court's instruction to the jury to disregard the confession in determining the defendant's guilt or innocence.

Still later, in *Chambers v. Mississippi*, supra, the Court held that the application of the Mississippi voucher rule to prevent the defendant from cross-examining a state's witness operated to deny the defendant his rights under the Confrontation Clause. The Court stated:

> . . . The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the "accuracy of the truth-determining process." *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970); *Bruton v. United States*, [supra]. It is, indeed, "an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, [supra]. Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. E. g., *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972). But its denial or significant diminution calls into question the ultimate " 'integrity of the fact-finding process' " and requires that the competing interest be closely examined. *Berger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969).

*Id.* at 410 U.S. 295, 93 S.Ct. 1046.

In the present case the competing state interest in applying Art. 34.24, supra, is to insure that the jury does not receive a false impression by hearing only a part of the evidence concerning an event. As we have seen, that interest was not well served, and in fact was done a positive disservice, by the admission of Mabra's first confession. Thus the state interest in this case, if exis-

tent at all, is minimal. Moreover, even if the state interest in presenting the whole picture were well served by the admission of Mabra's first confession, appellant's inability to cross-examine Mabra in order to measure the accuracy of the confession, combined with the extremely prejudicial nature of the matters asserted in the confession, would outweigh the state's interest. Compare *Bruton v. U. S.*, supra.

*Douglas, Bruton,* and *Chambers* teach us that when a state evidentiary or procedural law operates to deny a defendant his basic right to confront and cross-examine witnesses, the state law must give way in the absence of a convincing state interest in favor of the application of the law. The admission of Mabra's first confession in this case denied appellant his right to confront and cross-examine witnesses, and no competing state interest under Art. 38.24 was served. The admission of the confession was error of a constitutional dimension.

Contrary to the position of the majority, the error was not harmless beyond a reasonable doubt. The majority's discussion of the matter indicates that it relies on the strength of the State's case regarding appellant's *guilt or innocence* in determining that any error was harmless. Appellant's guilt or innocence, however, was never in question; appellant pleaded guilty to the jury. The sole task of the jury in this case was to make two determinations:

(1) whether the conduct of appellant that caused the victim's death was committed deliberately and with the reasonable expectation that the death of the victim or another would result; and

(2) whether it was probable that appellant would commit criminal acts of violence that would constitute a continuing threat to society.

Evidence was adduced at appellant's trial solely to aid the jury in making these two determinations.

The question for our consideration is whether the jury would have found the state's case *on punishment* significantly less persuasive had Mabra's first confession been excluded from evidence. Cf. *Schneble*

*v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). If there is a reasonable possibility that the confession contributed to either of the jury's two affirmative answers to the special issues set forth above, the error is not harmless. Cf. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Schneble v. Florida*, supra.

The state's case largely consisted of the testimony of four persons to whom appellant bragged that he shot the deceased. The state presented no eyewitness testimony concerning the offense. Appellant took the stand and testified that although he participated in the offense, he was not the triggerman. Appellant contradicted the testimony of the state's witnesses by denying that he told them he shot the deceased. In order to bolster its case that appellant did the shooting, the state introduced Mabra's first confession placing on appellant the entire responsibility for the robbery and murder, and exculpating Mabra.

Mabra's first confession was the only evidence introduced by the state concerning the actual commission of the offense. It was important to the state's case on special issue number one, as it provided the jury with information on the deliberateness of appellant's conduct, and on the expectation that death would result from his conduct. Appellant's admissions to the four state's witnesses shed no light on the circumstances of the offense, and thus were not significantly probative of the deliberateness of appellant's conduct. Appellant's testimony and confession cast doubt on the deliberateness of his conduct that resulted in the victim's death.

Moreover, in affirming the testimony of the state's witnesses that appellant was the triggerman, the confession almost certainly had an impact on the jurors' minds with respect to special issue number two. Juries undoubtedly (and reasonably) view triggermen as constituting a greater threat to society than nontriggermen. Appellant's testimony and confession raised an issue as to who was the triggerman. Mabra's confession tended to resolve that issue against appellant, and in so doing undoubtedly influenced the jury's determination of special issue number two.

It must be stressed that a jury's inquiries on the punishment issues are qualitatively different from its inquiry on guilt or innocence. The issues to be resolved at the punishment phase are much less precise. Key terms in the punishment issues such as "deliberateness" and "probability" have never been defined, and undoubtedly they are subject to varying interpretations. Predicting future dangerousness is at best imprecise, and often mere speculation. The range of evidence admissible at the punishment stage is largely determined by the trial court in its discretion. See Art. 37.-071(a), V.A.C.C.P. Thus the jury has a wide range of factors to consider in resolving the punishment issues. Given the imprecise nature of the inquiries on punishment, and the corresponding potential for disagreement among jurors on the determination of the special issues, it is unreasonable to conclude that the error in admitting Mabra's confession was harmless beyond a reasonable doubt.

In conclusion, the state's case on punishment was not overwhelming. There was ample room, absent Mabra's confession, for the jury to have answered at least one of the two special issues in the negative, thereby limiting appellant's punishment to life imprisonment. The majority errs in concluding that the error was harmless.

This case should be reversed and remanded for a new trial. I dissent.

ROBERTS, J., joins in dissent.

ROBERTS, Judge, dissenting.

Venirewoman Stulce could not have been excused properly; she stated unequivocally that she could consider giving the death penalty, and the only ground for excusing her was a misapplication of Section 12.31(b) of the Penal Code.

"Q. You cannot state that? [The "oath" of Sec. 12.31(b)]

"A. No.

"Q. You would think about what the effect of your answers were, and that

would necessarily intrude on your decision of how to answer those issues?

"A. Right.

"Q. That's just human, isn't it?

"A. Yes.

"Q. So, actually, you cannot state under oath that your deliberations would not be affected?

"A. No.

"Q. We understand each other, don't we?

"A. I think.

"MR. CURTIS: Your Honor, we would respectfully challenge for cause based on Section 12.31."

This is the very thing that the Constitution forbids. "Such a test could, and did, exclude jurors who stated that they would be 'affected' by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally." *Adams v. Texas*, 448 U.S. 38, 49, 100 S.Ct. 2521, 2528, 65 L.Ed.2d 581 (1980).

Even worse, when defense counsel tried to question the juror on the crucial difference between being "affected" generally and failing to answer the special issues impartially * (see *Adams v. Texas*, supra), the court twice sustained the State's objections to the questions because they departed from the statutory language. As *Adams v. Texas* teaches, it is necessary to go behind the statutory language if misapplication is to be avoided.

In the face of this error the Court today holds that the question was waived because "no objection was raised."

To begin with, the appellant twice asked questions which illustrated the improper application of Section 12.31(b), and objections to his questions were sustained both times. This was sufficient to call the court's attention to its error, and it was better than an objection would have been. It is simply fantastic to say that the appellant, who was

struggling to show the trial court that the juror could not be excused under the proper interpretation of Section 12.31(b), waived this ground or even made a procedural bypass of it.

In the second place, the Court can impose this waiver doctrine only by talking out of both sides of its constitutional mouth. On October 6, 1976, we held that there was no merit to an objection that it was improper to excuse a *Witherspoon*-qualified juror on the broader ground of Section 12.31(b). *Moore v. State*, 542 S.W.2d 664 (Tex.Cr. App.). Jury selection in this case began six months later (April 11, 1977). Now the Court holds that the appellant was at fault for not raising an objection that we had six months earlier held to be legally worthless. At the least it is ungracious of us to require defense counsel to recognize merit in an argument when we could not; at worst, it denies him due process and due course of law on appeal. It is tantamount to saying that our opinions on constitutional law are so notoriously untrustworthy that attorneys are not justified in following them.

Finally, I am not persuaded that our waiver doctrine is any better than was our mistaken holding on Section 12.31(b). It rose in *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.1976), on two legs: waiver and harmless error. The harmless error leg was knocked down promptly in *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 399 (1976). The waiver leg rests on the theories that defendants should not be allowed to "sandbag" trial judges and that counsel may deliberately choose, for tactical reasons, to waive certain rights. As I already have said, it is fantastic to say that this appellant was hiding his objections from the trial court; he was trying to ask questions to advance his (correct) theory, and the trial court rejected him. No tactical choice could have been involved. In any event, it is by no means clear that this doctrine of waiver by failure to object applies to *Witherspoon* error. See *Wigglesworth v. Ohio*, 403 U.S.

---

* "Can't you answer that factual question honestly, even though you know the effect of your answers?" Counsel also asked, "Do I take it by your answer that knowing the effect of your answer means that you couldn't answer it with complete integrity?" The court rejected the question as irrelevant.

947, 97 S.Ct. 2284, 29 L.Ed.2d 857 (1971) (reversing decision which held that *Witherspoon* error was waived). This error affects the very fact-finders; it is not like an improper grand jury venire or the trying of a defendant in a jail uniform.

We have decided this question of waiver in an off-handed manner only three weeks after the decision in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (No. 79–5175, 1980). It should receive full consideration, but it has not. I dissent.

PHILLIPS, J., joins in this dissent.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. Following his plea of guilty, the court instructed the jury to return a verdict of guilty. The jury then answered "yes" to the first two questions under Art. 37.071(b) and punishment was assessed at death.

Appellant contends the court erred in sustaining the State's challenge for cause to prospective juror Matha Stulce. The record reflects that the State's challenge was based upon V.T.C.A. Penal Code, Sec. 12.-31(b).[1] On original submission, it was held that appellant's failure to object to the alleged improper exclusion of Stulce waived the error for purposes of appeal.

This Court has consistently held that the failure to object to the improper exclusion of a prospective juror in a capital murder trial, waives the error for purposes of appeal.[2] In *Boulware v. State*, 542 S.W.2d 677, this Court stated the following:

---

1. That statute provides as follows:

 "Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

2. See *White v. State*, 610 S.W.2d 504 (Tex.Cr. App.); *Brandon v. State*, 599 S.W.2d 567 (Tex.

---

"In view of the recent decisions of the Supreme Court of the United States that a constitutional guarantee may be waived by a defendant's counsel for the failure to object such as to the improper organization of a grand jury at the trial level and our decisions above discussed on waiver, we hold that the failure to object to the improper exclusion of a venire member waives that right and it cannot be considered on appeal. *Hovila v. State*, [532 S.W.2d 243] and all cases insofar as they hold to the contrary are overruled. See also *Tezeno v. State*, [484 S.W.2d 374 (Tex.Cr.App.)].

"We hold that, absent an objection, the trial court did not err in excusing the jurors, Hurse and Holt, even though they were not questioned as thoroughly as they might have been with reference to their ability to render the death penalty no matter what the trial may reveal." Id. at 682 and 683.

The Supreme Court of California recently considered similar issues in *People v. Velasquez*, 26 Cal.3d 425, 162 Cal.Rptr. 306, 606 P.2d 341 (1980) and *People v. Lanphear*, 26 Cal.3d 814, 163 Cal.Rptr. 601, 608 P.2d 689 (1980). In those cases, the defendants were convicted of murder and sentenced to death. The convictions were reversed on appeal after the Court concluded that prospective jurors had been excused in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Court rejected the State's contention that the defendants' failure to object to the excusal of the jurors waived the *Witherspoon* error. The State then appealed and in *California v. Velasquez*, 448 U.S. 903, 100 S.Ct. 3042, 65 L.Ed.2d 1132 (1980) and *California v. Lanphear*, 448 U.S. ——, 101 S.Ct. 57, 66

Cr.App.); *Russell v. State*, 598 S.W.2d 238 (Tex.Cr.App.); *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.); *Burks v. State*, 583 S.W.2d 389 (Tex.Cr.App.); *Earvin v. State*, 582 S.W.2d 794 (Tex.Cr.App.); *Von Byrd v. State*, 569 S.W.2d 883 (Tex.Cr.App.); *Hughes v. State*, 562 S.W.2d 857 (Tex.Cr.App.); *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.); *Shippy v. State*, 556 S.W.2d 246 (Tex.Cr.App.); *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.); *Boulware v. State*, 542 S.W.2d 677 (Tex.Cr.App.).

L.Ed.2d 13 (1980), the Supreme Court of the United States vacated and remanded the causes for further consideration in light of *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

In *Adams*, the Supreme Court recited the factual setting of the case in the following manner, "[o]n the State's submission and *over petitioner's objections,* the trial judge excused a number of prospective jurors who were unwilling or unable to take the Sec. 12.31(b) oath." (Emphasis is added). The Court ultimately concluded that Sec. 12.31(b), supra, had been applied in Adams' trial to exclude prospective jurors on grounds impermissible under *Witherspoon.*

 Appellant urges that his failure to object to Stulce's exclusion on April 12, 1977, should be excused in light of the fact that *Adams v. Texas,* supra, was not decided until June 25, 1980. This Court has previously held that where a defect of constitutional magnitude has not been established at the time of trial, the failure of counsel to object does not constitute waiver. *Ex Parte Sanders,* 588 S.W.2d 383 (Tex.Cr. App.); *Ex Parte Casarez,* 508 S.W.2d 620 (Tex.Cr.App.); *Ex Parte Taylor,* 484 S.W.2d 748 (Tex.Cr.App.). Such a holding is bottomed on the premise that there was no tactical or logical reason for counsel's failure to object other than the fact that the defect had not been established at the time of trial.

In order for this Court to excuse appellant's failure to object to Stulce's exclusion, we would be required to assume that the prospective juror was acceptable to appellant in every respect and negate the possibility that appellant looked with favor on the court's action in excusing the venireman. Such an assumption would further require speculation that appellant would not challenge her for cause under Art. 35.-16, V.A.C.C.P., and that he found Stulce's age, sex, race, occupation, religious preference, marital status, prior jury service etc., acceptable to the extent that he would not have used a peremptory strike against her. Even if we speculate that appellant would not have challenged Stulce for cause or exercised a peremptory challenge on her, we cannot assume that he would have desired to have her as one of the twelve jurors (from the entire panel) who was to render a verdict in his case. We cannot conclude that the only reason appellant failed to object to the exclusion of Stulce was the as yet unestablished defect as found in *Adams v. Texas,* supra.

We therefore find that appellant may not complain of the exclusion of prospective juror Stulce for the first time on appeal. The appellant's motion for rehearing is denied.

ROBERTS, J., dissents for reasons given in his dissenting opinion on original submission.

CLINTON, Judge, dissenting.

The Supreme Court of the United States has now made explicit the fact that *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)[1] and its progeny,[2] have drawn the outer limit beyond which *the State* has no "valid" or "legitimate interest" in excluding prospective jurors for cause, on account of their "feelings," "views," "beliefs," or "opinions" about the death penalty.[3] *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). [Hereinafter, *Adams.*]

According to the Court, *"Witherspoon . . . is a limitation on the State's power to*

---

1. Hereinafter *Witherspoon.*

2. Specifically, *Boulden v. Holman,* 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and *Adams v. Texas,* infra.

3. Indeed, the Supreme Court made short shrift of the argument that V.T.C.A. Penal Code, § 12.31(b), is a "separate" cause for exclusion, distinct from the interests advanced by the *Witherspoon* doctrine:

"Unlike grounds for exclusion having nothing to do with capital punishment, such as personal bias, ill-health, financial hardship, or peremptory challenges, § 12.31(b) *focuses the inquiry directly on* the prospective juror's *beliefs* about the death penalty, *and hence* clearly falls *within* the scope of the *Witherspoon* doctrine."

*Adams v. Texas,* infra, 100 S.Ct. at 2528. (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

exclude: if prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, *the death penalty cannot be carried out. Witherspoon v. Illinois,* supra, [391 U.S.] at 522, n. 21 [88 S.Ct. at 1777, n. 21] . . ." *Adams,* supra, 100 S.Ct. at 2527.

And on what basis has the Court drawn the "line of neutrality," the point at which the State's "legitimate interest" ends, and the point past which execution of the death penalty "cannot be carried out?" As seen by the Court, the constitutional stakes are high:

"In its quest for a jury capable of imposing the death penalty, *the State produced a jury uncommonly willing to condemn a man to die.*

It is, of course, settled that *a State may not entrust* the determination of whether a man is innocent or guilty to a tribunal 'organized to convict.' [Citations omitted] It requires but a short step from that principle to hold, as we do today, that *a State may not entrust* the determination of whether a man should live or die *to a tribunal organized to return a verdict of death.* Specifically, we hold that *a sentence of death cannot be carried out IF the jury* that imposed or recommended it *WAS CHOSEN BY* excluding veniremen for cause simply because they voiced general objections to

4. Observing that Witherspoon's jury had "not been shown" to be "biased" with respect to the verdict of guilt, the Supreme Court characterized as *"self-evident"* the fact that "in its role as arbiter of the punishment to be imposed, this jury fell woefully short of that *impartiality* to which [Witherspoon] was entitled under the Sixth and Fourteenth Amendments. [Citations omitted]." *Witherspoon* at 518, 88 S.Ct. at 1775.

5. The State *has* a "valid interest" in excluding: (1) "prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt." *Witherspoon* at 513, 88 S.Ct. at 1772; (2) "those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them."

*the death penalty* or expressed conscientious or religious scruples against its infliction. *NO DEFENDANT can constitutionally be put to death at the hands of a tribunal SO SELECTED."* [4]

*Witherspoon,* 391 U.S. at 521–523, 88 S.Ct. at 1776–1778.

In short, the State—having no "legitimate interest" beyond obtaining a capital jury which will follow the law and abide by the juror's oath—is prohibited from employing any *method of selection* which operates to exclude jurors for cause on a broader criterion, because the Sixth Amendment forbids the result: "a tribunal, organized to return a verdict of death;" "a jury uncommonly willing to condemn a man to die."

The Supreme Court has provided a great deal of guidance to assist the states with their burden of implementing constitutional *methods of* juror *selection* in capital cases.[5] But the burden of effectuating the *Witherspoon* doctrine ultimately falls upon the states, including the legislatures and courts as well as those involved in prosecution. Not only the capital defendant has a great stake in the *method of selection* employed to obtain his jury:

"If the voir dire testimony in a given case indicates that veniremen were excluded on any broader basis than this, *the death sentence cannot be carried out* even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion."

*Witherspoon* at 514, 88 S.Ct. at 1772; (3) "veniremen who . . . made it unmistakably clear [a.] that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or [b.] that their attitude toward the death penalty would *prevent them from making an impartial decision* as to the defendant's guilt." [Emphasis original] *Witherspoon* at 522, n. 21, 88 S.Ct. at 1777, n. 21; *Adams,* 100 S.Ct. at 2525; (4) "those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." *Adams,* 100 S.Ct. at 2529; (5) those who are "so irrevocably opposed to capital punishment as to frustrate the State's legitimate efforts to administer its constitutionally valid death penalty scheme." *Adams,* 100 S.Ct. at 2529.

*Witherspoon* at 522, n. 21, 88 S.Ct. at 1777, n. 21. Thus, in Texas, the death penalty is not only vacated, but by virtue of Article 37.07, § 3(c), V.A.C.C.P., a new trial is required in every case in which the "voir dire testimony... indicates that veniremen were excluded on any basis broader" than that delineated by *Witherspoon.*

In *Witherspoon, the State's* jury *selection method* was condemned because prospective jurors who stated they did not believe in the death penalty were excused "without *any attempt to determine* whether they could nonetheless return a verdict of death;" those who admitted having conscientious scruples against the death penalty were excused "*without any effort to find out* whether their scruples would invariably compel them to vote against capital punishment." *Witherspoon* at 514–515, 88 S.Ct. at 1772–1773.

The *Witherspoon* doctrine, said the Supreme Court in *Adams,* "is not a ground for challenging any prospective juror," and it thought "this point may seem too obvious to bear repetition." But, it did repeat the point because the Court had noted "frequent references to *Witherspoon* as a ground for 'disqualifying prospective jurors,'" and it found that "the State, and the Texas Court of Criminal Appeals, might have fallen into the error of assuming that *Witherspoon* and § 12.31(b) are both *grounds for exclusion,*" explaining in the next paragraph how § 12.31(b) may lead to "exclusions *forbidden* by *Witherspoon.*[6]

Thus in my view, the burden on this State is clear: the voir dire examination of each juror must reflect an "inquiry which separates those who would never vote for the ultimate penalty from those who would reserve it for the direst cases,"[7] in order to show that "the jury-*selection standards* employed [have not] undermined 'the very integrity of the ... process.'"[8] *Witherspoon* at 523, n. 22, 88 S.Ct. at 1777, n.22, quoting *Linkletter v. Walker,* 381 U.S. 618, 639, 85 S.Ct. 1731, 1743, 14 L.Ed.2d 601 (1965).

There are those, however, who believe that the "serious prejudice" dealt capital defendants by a "State's practice"[9] which

6. *Hovila v. State,* 532 S.W.2d 293 (Tex.Cr.App. 1975) reflects just such an understanding of the *Witherspoon* doctrine, whereas *Boulware v. State,* 542 S.W.2d 677 (Tex.Cr.App.1976) in overruling *Hovila, id.* at 683, did not. *Adams* alludes to *Hovila* favorably; it is omitted from the list of seven opinions perceived by the Supreme Court to indicate the Court, as previously constituted, might have fallen into error. *Adams,* 100 S.Ct. at 2527, 2528, n.6. On the other hand, *Boulware,* supra, is relegated to a single mention in the solitary dissenting opinion of Justice REHNQUIST. This poetic justice is not lost on the writer.

7. *Witherspoon* at 515, n.9, 88 S.Ct. at 1773, n.9.

8. Judge Onion (now Presiding) fully grasped the import of *Witherspoon* as regards the burden placed thereby upon the State in *Harris v. State,* 457 S.W.2d 903 (Tex.Cr.App.1971) when he wrote:

"Before prematurely challenging for cause a prospective juror who has only affirmatively answered the so-called statutory question, *prosecutors* should go beyond such initial expression of 'conscientious scruples' or disclaimer of belief in capital punishment to *clearly ascertain and establish* that the prospective juror would automatically vote against the death penalty in any case regardless of the facts, could never vote for or consider its imposition in any case irrespective of the evidence, could not abide by the existing law and would not follow the trial court's instructions, could not assess such penalty in the particular type of case at bar, etc.

If the defense counsel with or without interrogation indicates there are no further questions, it may be well for *the court to inquire* if such action means that the defense is not opposing the challenge for cause, or if the defendant personally and his counsel are affirmatively [satisfied that the juror is impartial], and *make sure such colloquy is made part of the record.*"

457 S.W.2d at 911–912. Accord: *Grider v. State,* 468 S.W.2d 393, 398–399 (Tex.Cr.App. 1971).

While the disposition in *Harris,* supra, was subsequently reversed by the United States Supreme Court in *Harris v. Texas,* 403 U.S. 947, 91 S.Ct. 2291, 29 L.Ed.2d 859 (1971), we are safe in assuming that the reversal did not implicate the language quoted above.

9. In synopsizing its decision in *Witherspoon,* the Supreme Court observed that "[t]he State was held to have no valid interest in such a broad-based rule of exclusion....* * * The defendant, on the other hand, was seriously prejudiced *by the State's practice.*" *Adams,* 100 S.Ct. at 2525.

"crosse[s] the line of neutrality" and "produce[s] a jury uncommonly willing to condemn a man to die," may be waived by the defendant should he fail to object. Anomalous as this notion is, insult is heaped on injury when the only justification cited for it is the Supreme Court's vacating for further consideration in light of *Adams* two California Supreme Court judgments reversing capital murder convictions.

The majority implies that the United States Supreme Court granted *certiorari* on the second question[10] presented in both *California v. Velasquez*, 448 U.S. 903, 100 S.Ct. 3042, 65 L.Ed.2d 1132 (1980) and *California v. Lanphear*, —— U.S. ——, 101 S.Ct. 57, 66 L.Ed.2d 13 (1980), then remanded the causes for further consideration in light of *Adams*, because the latter, in laying the factual setting, stated jurors had been excused "over petitioner's objection." In the realm of speculation it is far more likely, however, that the Supreme Court's concern with *People v. Velasquez*, 26 Cal.3d 425, 162 Cal. Rptr. 306, 606 P.2d 341 (1980) and *People v. Lanphear*, 26 Cal.3d 814, 163 Cal.Rptr. 601, 608 P.2d 689 (1980), focused on the excessively literal and dogmatic application of the *Witherspoon* doctrine insisted upon by the California Supreme Court, which not

merely prejudices, but obliterates "the State's legitimate efforts to administer its constitutionally valid death penalty scheme."[11] *Adams*, 100 S.Ct. 2529.

More than an asserted proposition of law, I sense in the conjectural resort to *California v. Velasquez*, supra and *California v. Lanphear*, supra, a touch of hostility toward the United States Supreme Court for its failure to draw a black and white pictograph telling the State courts of last resort that being given the death penalty by a "tribunal organized to return a verdict of death" constitutes harm to an accused *per se*, harm of such a fundamental nature that the presence or absence of an objection by the defense is inconsequential. This wait-and-see attitude is a sad departure from the care with which this Court meets its onerous responsibilities. How many more of capital murder convictions will ultimately be reversed as a *direct* result of such an untenable application of § 12.31(b), supra, vis-a-vis *Witherspoon*, recently rectified by *Adams*? To what extent shall we go in adding to the list of decisions already faulted?

This Court is fully capable of an independent, dispassionate reading and analysis of the numerous authorities on the subject,[12]

10. In *Velasquez*, supra, the second question presented was,

"(2) was alleged *Witherspoon* error in this case waived by defense's failure to object?" 27 CrL 4068.

In *Lanphear*, supra, the virtually identical second question presented:

"(2) was alleged *Witherspoon* error in this case waived by failure of defense to object?" 27 CrL 4155.

11. In *Velasquez* and *Lanphear*, the first questions raised by the State of California in its petitions for writ of *certiorari*, respectively, were:

"(1) May prospective juror be removed for cause under *Witherspoon v. Illinois* when he states that *there might be hypothetical* case in which crime was so heinous that death penalty could be considered *but that he has not been able to think of hypothetical of that nature?*" 27 CrL 4068.

"(1) May prospective juror be removed for cause under *Witherspoon v. Illinois* if trial judge has described each of separate decisions regarding guilt, special circumstances, and penalty to be made by juror, and juror states that he *does not think he could partici-*

*pate* in deliberations which might lead to the death penalty." 27 CrL 4155.

The Supreme Court of California had, of course, reversed the convictions in *Velasquez* and *Lanphear* because such jurors were excused, holding that *Witherspoon* permits exclusion *only* if "automatic opposition" to the death penalty is made "unmistakably clear."

If obscured in the past, the opinion in *Adams* leaves no room for speculation as to the State's "legitimate interest" in capital voir dire. See n. 5, *ante*.

12. Of course, no objection was voiced in *Witherspoon* itself, nor in *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970); and in *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969) the defense actually *assented* to exclusions, as did the defense in *State v. Wigglesworth*, 18 Ohio St.2d 171, 248 N.E.2d 607 (1969) [holding defendant waived *Witherspoon* error], reversed *per curiam* in *Wigglesworth v. Ohio*, 403 U.S. 947, 91 S.Ct. 2284, 29 L.Ed.2d 857 (1971). See also *Harris v. State*, 457 S.W.2d 903 (Tex.Cr.App. 1970) [holding that *Witherspoon* error was waived by failure of defense to object], re-

motivated only by the welfare of the criminal justice process in this State and the integrity of the law. It requires no extraordinary insight to conclude that, given *Witherspoon* error cannot be "harmless," [13] neither can it be "waived" by a failure to object. But like one who stands with his back to the street because no one told him the parade is passing by, the majority indulges a delusion that liability for the barrage of reversals it ensures today lies elsewhere; in truth it lies only here.

I dissent.

TEAGUE, J., joins.

versed in *Harris v. Texas*, 403 U.S. 947, 91 S.Ct. 2291, 29 L.Ed.2d 859 (1971). In *Davis v. State*, 236 Ga. 804, 225 S.E.2d 241, the objection was found "insufficient," but still the voir dire examination was held constitutionally inadequate, *id.* 225 S.E.2d at 244.

13. *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) [holding that the lack of systematic, intentional exclusion of a qualified group of jurors is not the determining test, but rather, whether "a venireman is improperly excluded," and if so, "any subsequently imposed death penalty cannot stand]."

See also *Witherspoon*, 391 U.S. at 523, n. 22, 88 S.Ct. at 1777, n. 22, wherein the Supreme Court stated:

" . . . [W]e think it clear, . . . that the jury-selection standards employed here *necessarily* undermined 'the very integrity of the . . . process' that decided the petitioner's fate, . . . and we have concluded that neither the reliance of law enforcement officials . . . nor the impact of a retroactive holding on the administration of justice . . . warrants a decision against the fully retroactive application of the holding we announce today." [Citations omitted]